Mr. Asbel, I believe you're going first. That's correct, Your Honor. May it please the Court, I'm Jason Asbel. I represent Appellant Staples. I'm taking the first seven minutes of argument. Attorney Daniels has the following eight minutes of argument and the appellant's request to reserve two minutes of time for rebuttal. Okay. This case presents the concept of a conspiracy stretched beyond its breaking point. Nowhere is that more evident than in the introduction of a mountain of child pornography that bore no connection to either defendant Staples or defendant Heatherly. This included nine child pornography videos that were played on the Zoom room. Mr. Staples was not even logged into the Zoom room for eight of the videos. But wasn't the purpose of playing it to show the comment agreement, to show that even though he wasn't present at the time some of those videos were played, that that was part of the conduct that he had agreed to? I thought that was the purpose for playing it. Your Honor, the government played videos from one day and that was the government's stated purpose. However, it holds no probative value for purposes of 403 because Mr. Staples wasn't even wasn't even logged into the Zoom room when those various items were being played. That's a difficult and that's a different question. Very difficult question. But go ahead. I understand where you're going with it. Even if there was some probative value and it does not appear that there is any, it was certainly substantially outweighed by the prejudicial effect of such horrible, violent and disturbing videos. Mr. Espel, you represent Mr. Staples, correct? That's correct, Your Honor. Mr. Staples' defense at trial was he was just interested in adult men. He was a gay man, but he had no interest in children. So the culture of the room as an out-of-the-way place where people go specifically to watch child porn was highly relevant to showing there's a conspiracy agreement among these people and also to disprove this defense that your client was really just interested in men, not children. You say it has no probative value? That's right, Your Honor. And first, the reason why that was, the whole reason how that came up at trial as far as the interest in other adults was because the government introduced Mr. Staples' statement where he said that. So the government cannot open their own door to making these items relevant. And second, Your Honor, that even if there was any probative value at all, that could have been demonstrated in other ways. Agent Blackadar testified that she had been monitoring the room. She could have testified about, and she did testify about the types of materials that she observed when she was in that room. That's a 403 argument, though. That's the 403 argument. That's correct, Your Honor. That is part of the 403 argument. Look, as a matter of 403, Old Chief says almost always the government can prove its case how it wishes. It's not forced to stipulate, set aside this weird little pocket of felon and possession cases. If it needs to make something out, it can make it out in the way that tells a story, not just it could have done it this other way. So it's not enough to say she could have done it another way. I take the government to be saying there's a specific culture that grew up around this room that means all the people in it knew what they were getting into and working together. There's a series of obscene screen names people are using. People are requesting, you know, hot baby videos. There's a culture that requires the cameras to be on as they watch one another do their stuff, you know, guarding against possible informers. One person showed up in the room and seeing what was going on there, the names of the people and stuff, said, hey, this is kid stuff. I don't want it, and went away. Your client didn't do that. And so isn't it relevant to show over the course of the conspiracy what the culture is? And once there is a conspiracy under Pinkerton, you know, and related doctrines, the hearsay exceptions, all of the stuff the different co-conspirators are saying can come in. So what's your response to the government's argument on that? So while Old Chief certainly exists, this court has established that child pornography evidence is particularly horrific and deserves particular consideration and sensitivity when it is being considered for presentation to the jury. And that is what the Cunningham case articulates and its progeny articulate. And so what the court is supposed to do during the Rule 403 analysis, which it did not conduct in this case, it is actually supposed to weigh that unfair prejudice versus any probative value. And there is no record where that is done in this case, so the case should be reversed and remanded on that basis alone. However, even here, you are talking about an overwhelming amount of child pornography evidence where Mr. Staples wasn't even logged into the Zoom chat room. There are, in addition to those nine videos that I mentioned, there are over 6,000 lines of text. Maybe 10 or fewer of those lines were attributable to either Mr. Staples or Mr. Sterling. And the government has introduced all of those statements at trial, all of those videos at trial, in addition to the child pornography that was found on Mr. Staples' computer and Mr. Heatherley's computer. And what this court has said in Cunningham and the like cases is that that particular type of evidence is so unfairly prejudicial that it needs to be carefully examined before it is entered. And that examination simply did not. Wait, wait. Cunningham was a case where the court didn't view the videos. Here, the court said it viewed the videos. So there was more examination here. Your objection is not really to the examination so much as the failure to explain it on the record, correct? That's right. The explanation is that – or the argument here is that there is no 403 analysis that is conducted on the record. Why isn't it implicit that the court engaged in a 403 analysis? To one defendant, it wasn't even mentioned, but it's the other one it was. But the court was clearly aware of the fact that if you get to a situation where the evidence coming in is so prejudicial that it outweighs whatever probative value it may have, and there's other evidence in the record that you've testified to – or argued yourself here that people have testified to a trial, that a lot of this conduct can be established by the Canadian agent who just got on the stand and explained what was being shown in this video. So the court was aware of the need to be careful here, especially in this kind of case. Why wasn't there an implicit balancing that was conducted? And to build on Judge McKee's question, before trial this issue is raised, and the court says, hey, I'm going to defer it. I'm going to need to do a 403 analysis before I let this in. So the court has flagged, I know I've got to do this. And then it comes later, and it's been linked up, and then the court says, okay, I've heard the arguments. I'm letting it in. Given those things, shouldn't we understand that the court had done an analysis? Isn't this about as much record as we had in the Finley case where it wasn't fulsome? We might prefer more, but is there so little that it's reversible error? There is so little that is reversible error, and the Finley case was certainly different because there the Finley court explicitly made the finding that the probative value outweighs any prejudice. As the court mentioned in the Finley opinion, it did conduct a 403 analysis that is on the record, although it might not have been as detailed as would have been helpful later on. Here there is simply nothing like that. Let me ask you, doesn't the fact that the jury acquitted on two counts indicate that if there is any error, it would be harmless? No, I disagree, because the fact that the jury acquitted Mr. Staples of one count and Mr. Heatherly of two counts indicates that the evidence was not as overwhelming as it was in the other Third Circuit cases that have looked at similar issues. It also indicates that here there were problems with the government's case, and it was by stockpiling this obscene yet irrelevant evidence that the government was able to pursue convictions on the counts where it did obtain conviction. You keep saying irrelevant, and I think Judge McKee is right. It's more relative probative value, relative prejudice. And Cunningham was a case, part of it was a procedural problem the court didn't view it, and part of it was that there was this cumulative value. It was only added a little bit on probativity, but then it added a lot on prejudice. Ultimately, there's a balancing to be done, but don't our precedents say, even if you're right, the district court didn't do the balancing, we can do the balancing ourselves on appeal and reviewing it? If we did that, we wouldn't be deferring, but we could still affirm if we decided ourselves that the probative value wasn't substantially outweighed by the danger of unfair prejudice. That is what the authority says, and here, of course, with 6,000 lines of text, nine videos that include bondage, torture, children screaming and crying, and our clients not even logged into the Zoom chat room for most of those videos, there simply is no way to find that such evidence does not present substantial unfair prejudice. Well, let's talk about those lines of chat. The lines of chat that Mr. Staples and Mr. Heatherly engaged in look like they were encouraging, hey, show me some more, hey, I'm getting very excited here, to put it mildly. Don't they show he's not a passive bystander, he's not being taken unawares, he's a part of this conspiracy? So if he's part of a conspiracy, all the other stuff can come in as statements of co-conspirators. So what Mr. Staples was convicted of, and I do want to be mindful, I certainly want to answer all the court's questions, I don't want to eat too far into Mr. Daniels' time. You won't. We'll make sure that we give him time and we'll compensate by giving your colleague time. And I'm sure that the last thing you'd want to do here would be to shorten the prosecutor's argument. So I cannot imagine that you'd want to do anything like that. That did not cross my mind, Your Honor. I'm sure it didn't, no. But with respect to your question, Mr. Staples was convicted of Count 13, the conspiracy to post a notice or advertisement. And as far as your questions about don't his statements show that he was engaged in a conspiracy for purposes of that count, well, those might be substantive offenses of him posting a notice or advertisement. But it's not evidence that he was engaged in a conspiracy to do so, or it alone is not sufficient to show that he was involved in a conspiracy to post a notice or advertisement. And that's obviously an important distinction because the potential sentences between a conspiracy to post a notice or advertisement and to a conspiracy to receive child pornography are vastly different. And that is why it is such an important distinction to make for purposes of it. Thank you. Mr. Berry. You have to unmute. Okay. Yes, Your Honor. Do you want Mr. Daniels to do the other part of his argument of the defense's argument or do you want the United States to go forward? I'm sorry, I've got between the votes on the screen and okay. You're right, Mr. Daniels, go ahead. Thank you, Your Honor. As may it please the court, my name is Robert Daniels. I'm arguing on behalf of Dylan Heatherly. My argument focuses on the application of the sentencing guidelines in this case. My client in particular was acquitted of two counts and convicted of one count of a substantive offense and another count of a conspiratorial or incoherent offense under 2252A2. That particular statute has a 20-year maximum. And in applying the guidelines to this particular case and to that conviction, we're guided to a statutory index, Appendix A, that for conviction for that offense, we should use 2G2.2, which would give a base level offense of 22. In this particular case, the issue was a cross-reference that was found under 2G2.2C1, which permits in certain very limited instances to utilize a different cross-reference. And the cross-reference, and I outlined it in my brief, in my reply brief, requires an individual to engage in sexually explicit conduct for the purpose of producing a visual depiction or for the purpose of transmitting a live visual depiction. All right, so Mr. Daniels, the differences between 2G2.2, which is basically about just passing around child porn, receiving or selling it, versus having some involvement in producing it or inducing it or getting a minor to engage in it. Well, the district court appears to have found that each defendant here contributed to Augusta's creating videos of himself abusing victim one. There was discussion about this, as you discussed at trial. It was a live event. This was going on. And so they weren't just playing old videos. Weren't they collectively, these people cheering on and egging on Augusta to abuse this six-year-old boy? Your Honor, I respectfully disagree with that recitation of the facts. In fact, looking at the statements, and I suppose that's the trigger that gets my client involved in this portion of the event, there's a whole penumbra of different statements that are presented at different times. Through the testimony of the government's witnesses, we know that Augusta did not even receive the video that was requesting video. Essentially, my client said, does anyone have any vids? That's the extent of his involvement, and then a comment later on. So we know from the forensic evidence and the computer that was seized from Augusta the next day, Augusta never saw that comment. Why does that matter? That's important because if you look at the cross-reference in the arguments of the government, he has to cause, he has to cause, directly cause the live abuse of the child. And again, I think the ultimate question is, would this have happened without Sutherland, the pseudonym for my client, or not? And the answer would be yes. The cross-reference in 2G2.2C1 says if the offence of causing, reporting, permitting, or offering or seeking by notice or advertisement, if he was seeking it, it doesn't have to satisfy causing. So in your honor, that's the point I made in my brief. There is no indication that he was seeking any type of live abuse. And in fact, there was no finding by the PSR or by the court, other than by the imposition of that guideline, that he actually caused the live or even sought the live abuse of a child. There's a distinction between seeking videos and live abuse. And if you look at some of the cases that I cited in my brief, this is borne out by several different cases that have interpreted the statute, including US v. DAWN, which is another circuit. The purpose of that enhancement is to punish the producer or the manufacturer of the live event more than a possessor. So I think we can set aside your argument in the brief in part was videos necessarily has to be past conduct. And then Mr. Berry points out we're engaged in a video right now. So nothing about the fact that he asked for vids means it had to be confined to the past. And when Augusta started showing a live child, people started giving him orders. Well, how about you walk around like this, et cetera, that they could see it was live. They got excited about that. So the nature of its being video doesn't mean they were asking only for retrospective stuff. They encouraged it. Judge, and again, that's what one of the cases I cited was Crandon. It has to be his specific attempt, intent to get that live video. And there's some lack of clarity as to what was being viewed by Mr. Heatherly at the time. So he signed out shortly after what they've termed live abuse occurred. We don't have a recording of that abuse. We know from their witnesses that you have no idea what an individual is viewing on their screen at any time. I cited that. In addition, Your Honor, there is no indication that, as I indicated before, that Augusta had received the inquiry regarding the live abuse. There was no comment, specific comments attributed to my client to the live abuse. And we're guessing. We're guessing what these individuals were viewing on the screen. Because, as is outlined in my brief, there are a number of different alternatives. And each and every one of their expert witnesses essentially says, you have no idea what an individual is looking at on a screen when you're looking at the evidence outside of it. And we don't have any recordings from that date in question from my client. And the only comment we have is one that does not cause the abuse of a live abuse of a child. I see that my time's up. And if there are any other questions, we'll proceed to Mr. Berry. Mr. Berry? Good afternoon. May it please the Court. Mr. Daniels, Mr. Asbel, good to see you again. My name is Austin Berry, and I represent the United States of America in this appeal from a jury trial in which the jury convicted two defendants of various child exploitation offenses that stem from a two-year conspiracy during which these defendants repeatedly aided and abetted co-defendants in an effort to consistently receive child pornography through the Zoom platform. This was an ongoing scheme, not a single-day event. Both defendants frequented Zoom rooms that were dedicated safe spaces designed to foster a sense of security for like-minded pedophiles to request child pornography and consume it in an on-demand format. Let me ask this. For everybody involved, and it's obvious in reading these briefs, I don't think I've ever seen a case before where the defendant's briefs start out talking about how absolutely disgusting and obnoxious the underlying conduct is, and it's inappropriate. And I applaud Mr. Asbel and Daniels for their candor. Our job, obviously, is to try to cut through the emotion, and it's difficult, very difficult, and try to just focus in on the legal issue. But that's the whole reason for Rule 403. It's exactly why 403 is there. Because left to their own devices, many prosecutors, and I'm not suggesting, Mr. Berry, that you are one of them, but you know better than me there are many prosecutors who will just go bananas and try to bring as much bad stuff in to get the jury to decide the case not based upon evidence, but based upon emotion. Having said all that, when you've got just an incredible volume of testimony, you've got recorded chats, these damn videos that came in, I have a real hard problem trying to figure out why the prejudicial potential did not outweigh the probative value. Because the probative value has already pretty much been established. The jury knows what these folks are looking at, what they're into. And in your brief, you suggest, well, it's mitigated because some of the stuff was fast-forwarded through. My God, when I read that, I choked. That makes it so much worse for the jury to be sitting there and see this stuff fast-forwarding through. It almost becomes like a pantomime that these men were engaged in with these incredibly victimized kids. And I'd like to know where they are. And it's outside the record, but I can't help but be concerned about what happened to them and is anything being done for them. But why do this? I'm not sure if you're a trial counsel or not, but, you know, my God. When I was a prosecutor, there was one judge where our job was not only to convict beyond a reasonable doubt, but secondly, to protect the record, because he was so pro-government. He would have admitted anything we asked him to admit. So we made a conscious effort within the office to not even get close to the line if we could otherwise prove our case. Why get into this? Why do these videos? Yes, Your Honor. So one thing I would like to point out and emphasize is that if you look in the briefs and in the record, what you see is that we played 68 seconds, 68 seconds from a two-year conspiracy. So when we talk about the government putting in too much of this type of contraband evidence, this is a case about visual depictions. Yeah, but one still frame. Talk about a picture being worth a thousand words. Sixty-eight seconds worth of video frames. I don't know how many pictures that equates to, but it's exponential. It's a hell of a lot of pictures. One frame. If you get the right frame here, I would suggest that's really getting close to and maybe over the line, because it seems to me there's an equation here. The less shocking the video, the more you can probably play it without crossing over 403 parameters. But the more shocking it is, the more you have to guard against any exposure to the jury. And it does seem to me that one of these frames would be enough in the minds of those jurors to just drive them up a wall and want to assassinate these defendants themselves. Forget about incarceration. The thing that undermines my argument is the fact that you do have two acquittals here, which frankly surprised the hell out of me. You think both. Yeah, it undermines the prejudice argument, really. The jury did compartmentalize. Yes, Your Honor, and that's exactly where I was headed, and you had already addressed this previously. So what I want to say is the theory, of course, is that child pornography is so reprehensible and so shocking per se, so shocking to the conscience that viewing it in small bursts, totaling just over one minute, would deprive the jury of all reason and set them on a course to ignore the court's instructions, violate their oaths, and shut their minds to other evidence or arguments. But that didn't happen here, as Your Honor points out, because there were acquittals of two of the most serious charges in this case. This jury took the instructions and their oath seriously, and they understood how they needed to assess it, and they applied the law to the facts and ultimately gave a mixed verdict. And the case law on mixed verdicts on that suggests that or makes clear that that is not unfairly prejudicial, or at least it's demonstrative of it. Yes, Your Honor. So your friends on the other side are arguing, it wasn't really a conspiracy. We weren't there on that day. We didn't see it. We weren't encouraging it. And so your argument for letting this in is, no, it's important to establish this is an ongoing thing with a bunch of videos or a bunch of times such that it's a real conspiracy. People could see it was like this. They would have dropped out like that one guy did if they didn't want it. They were assuming, because this is a bunch of things, not an isolated incident. I'm trying to understand how you read Cunningham, because Cunningham's the best case for them. What limiting principles are there on Cunningham that allow you to put in this evidence consistent with Cunningham's holding? Because clearly there are some rule 403 limits there. How should we read that case, and what is it that puts your case on the right side of the law? Sure. As Your Honor already pointed out, Cunningham's primary problem was that the court did not review the evidence. In fact, I got my hand slapped a little bit by Judge Kaine in one of our, I don't know if it was during trial or one of the pretrial hearings. So I'm not 100% whether it's in your record right now. But I remember asking Judge Kaine, hey, Judge Kaine, we've got Cunningham in the Third Circuit. I'm really going to need you to review this evidence. And she got a little chastised me a little bit about telling her what to do on that.  And of course, as Your Honor pointed out, she said she did. She said on one occasion on the record, she said, I've reviewed everything in the red binder. And to make clear, what we did is we separated the contraband into the red binder, the non-contraband into the black binder. So when she says that, she's saying I've reviewed all of the contraband in this case. And that separates Cunningham for sure. With regards to the 403 analysis, I think it's clear that she did engage in a meaningful review. Your Honor already started to summarize that to some degree. But first, she read the pretrial briefing by both sides and concluded that while some of the evidence is relevant, some she could not conduct or conclude that it passed the 403 test until she saw it at trial and in context. So then she waited. And then on day two of the trial, I tried to admit, the government tried to admit some of that evidence. And just to be clear, I am a trial counsel in this case, as are Mr. Asbell, Mr. Daniels. We all three tried this case together. And so I tried to put that in. The government did. And she said, I see there's a connection to Mr. Heatherly. I don't quite see it to Mr. Staples yet, Mr. Berry. I need to wait a little bit before we do that. So that's, again, her very cautiously approaching this evidence and realizing that she needs to tread carefully to make sure that it doesn't get admitted prematurely or against a defendant who it doesn't apply to effectively. And then on day four, she admits the exhibits over the defendant's objections. And then most importantly, which I think has been overlooked in the briefing, is that there was post-trial briefing. There was a motion for judgment of acquittal by Mr. Staples. And in that post-trial briefing, Judge Kane issued an order in which she explained that she considered 401 and 403 and concluded at trial and maintained after trial, obviously, in this order, that the evidence was not unduly prejudicial. So I think the record is replete and complete in terms of the context of the entire case that she adequately reviewed it and that she was careful and considerate and conscientious in thinking about these very issues that are concerning the court all the time in child pornography cases. This is all I do. These are all the cases I do. And so I'm very conscious of that as well, which is why when it came time to publish these exhibits to the jury, again, I'm not 100% that this is in the record either, but I asked both Mr. Daniels and Mr. Asbell, do you want me to play 10 seconds in real time? This goes to your question or your issue, Judge McKee. Do you want me to play 10 seconds in real time or do you want me to play the whole thing in a fast-forward fashion at 10 seconds? I thought they were going to choose the former. They chose the latter. And so to the extent that one bothers one person more than another, this was actually something I discussed with defense counsel about which presentation would they prefer, and I gave them that option. So when we did it, again, we were doing it in 10-second bursts to give the jury an understanding of what this conspiracy was about. We only have captured from July 22, 2015, but we have records showing that this conspiracy was going for two years. And as Mr. Daniels pointed out just a moment ago in his argument, we don't know what Mr. Heatherly was seeing that day. That's precisely why we had to put in this video evidence from other times so that what the jury could do is they could take what the visual evidence we did have, combined with the chat logs that went along with the visual evidence we did have, and then they could make a reasonable inference to the other chat logs that we have of what the defendants must have been viewing at that time. So, for example, on February 28, 2015, we have chat logs of Mr. Staples engaged in a private communication with Mr. Augusta, at which point Mr. Staples and Mr. Augusta are talking, and Augusta says, hey, how's the room in here? And Staples says, it's fine. There's no one sharing. And Augusta says, well, are there any limits? And as the testimony at trial showed, a no limits room is a reference to the idea that everyone in that room is good with any kind of child exploitation material. Some people have limits like I don't like to see babies. Some people have limits like they don't want to see scat. Other people have no limits whatsoever. What is scat? Scat, Your Honor, is a reference to feces. Sorry I asked. Yes. And so some people have limits and some don't. And what Mr. Staples told Mr. Augusta that day is no limits in this room, knock yourself out, essentially, right? And right after that, Augusta starts live abusing that child again. We only understand what that visual depiction must have looked like because we captured it on July 22, 2015. And that probative value becomes exceedingly important to understanding the full conspiracy of what happened in this case. And the same with Mr. Heatherly saying, well, the Toronto agent didn't start recording until after he had logged out of the room. Well, we have the chat log from when he was in the room. And what we can see is that Mr. Heatherly says, really appreciate, so appreciated someone showed vids about need to bust before work. Obviously a reference to masturbating before he goes to work. And right after that, we see more chats indicating where the jury could reasonably infer that Mr. Augusta brought out that six-year-old boy and started sexually abusing him. And then we see one more chat from Mr. Heatherly saying, so close here. And then about four minutes go past and we see more chat logs indicating that people are really watching what's happening with this six-year-old boy. Look at that throbbing, some other crude comments on the abuse. So we know that Mr. Heatherly, or it's reasonable for the jury to infer that Mr. Heatherly was in fact watching this abuse. I don't know if my colleagues want to stay on four or three, but I would like you at some point to talk about this cross-reference argument that maybe there's not actual causation here if he didn't see the live abuse. Maybe your argument is we can infer causation in February 28th or some other time. But if we're focusing on July 22nd, is he really guilty of seeking by notice or advertisement live abuse? Is there a specific intent requirement and do they possess it? Or are you just going to dispute the premise and say there's causation based on all the other times that this happened? So I think we have causation for Mr. Heatherly on July 22nd for the reasons I just stated. He's saying, so appreciated if someone showed vids. And as this court has pointed out, this is a vid. The July 22nd argument from dependents is that Augusta didn't actually see these chat logs on July 22nd. So it didn't in fact cause him to do it. Now, maybe that's not a correct reading of the forensic evidence, but that's their argument. What's your response? My response is that on that same day, on July 22nd, in the chat logs, which the jury had in Exhibit 55, there is a comment by Mr. Augustus to someone else later after the live event ended that indicates why Augusta or what motivates Augusta. And one of the things he says in the chat log is he's responding in a private message to someone else. And I can't remember if it was Mr. Staples or someone else. And he says there were only about 45 people here wish there had been more. And what we see through the full record of Exhibit 55 is that what was important to Mr. Augusta was the voyeurism or the people seeing him. And so he really liked to have a large crowd to see him abused. And so when Mr. Hetherly says he didn't specifically cause this, he's basically saying if he wasn't there, this boy would have been abused anyways. Well, 44 other people might have been able to say the same thing. But the collective, the collective group of them as co-conspirators, their combined effort in being in this room, in this dedicated room to child pornography, motivated Augusta to live abuse. He didn't do this on one-to-one, wasn't doing this on a one-to-one Skype with someone else. He went into these rooms, waited till people really, really wanted it, if there wasn't any other streaming going on, and he felt like it. And so really, in many ways, the fact of numbers being in there, the fact that he was in there present would motivate Augusta to do that. We are not relying exclusively on the idea that Mr. Hetherly just was present in there. We didn't charge everyone who was just present. But I think you can take from Mr. Augusta's comment that there was only 45 people, and I wish there had been more, to say that he was motivated by the mere presence of all these people. And then you combine that with Mr. Hetherly saying, so appreciate if someone would show. And in fact, Augusta said, all right, I'll meet you there, and shows up. We don't have to show that Mr. Augusta literally read every single message where people were asking for it. He understood that room just like everyone understood that room, that this is a dedicated environment for like-minded pedophile to seek and receive child pornography by posting requests for it. Certain people would post and request certain types. Some would say, I love bald, anything boy or girl. Okay, so can you talk about if we do want to focus on whether they were aware that they were seeking live stuff as opposed to videos, what's the best evidence that both Hetherly and Staples knew they were watching and encouraging live stuff at some point? I mean, with Staples, it's easier because he's having a direct communication with Augusta on February 28th, where it looks like they knew each other from a time past. I don't think we can show that Mr. Hetherly specifically was asking for something live. But as your Honor pointed out, what we have to show is that he's seeking, doesn't have to cause it, but he's seeking child pornography by posting a notice or advertising. And the fact, I don't think that the defendants on a preponderance evidence standard at sentencing, which is where we are, I don't think that the defendants get to escape liability for the live abuse of this boy by saying, ha ha, gotcha, I only asked for a video. You brought out a live boy. I wasn't actually interested in that. There's just no evidence of that at all. And I don't think the United States is required to prove that Mr. Hetherly had to say the words, I would like to see someone live abused. The request, the posting, the seeking by notice or advertisement, a request for child pornography in whatever form it came, whether it was prerecorded or live. You didn't see Mr. Hetherly say in those few minutes when the live abuse was going with, whoa, whoa, whoa, I only asked for a video. I'm out if you're going to live abuse a child, which of course, as your Honor alluded to that, that character loved furry men, certainly wasn't interested in any kind of child stuff and stepped out. That wasn't Mr. Hetherly's response. Mr. Hetherly's response was so close here. And then four minutes later, he logs out because he was done with what he was watching, not because he didn't like what he saw, but because he finished what he was doing and logged out. Thank you. We're we're way over. Any other questions at all? Judge Davis did for days. Who is going to take the bottle time for the defendants? Your Honor, I'm going to take rebuttal. If it's OK with the court, just briefly, with respect to the last arguments, the problem with that argument that it's a collective effort is the guideline calls for a specific intent, which is outlined by the of the individual causing the causing the live abuse. And that's it's just not present. I think Mr. Burry's arguing that each individual person had the intent and the activity was enhanced by the presence of the audience. I could be right. That's what he's saying. In your honor, respectfully, that's that's not what the the cases that I cited indicate. They indicate that it has to be his specific intent to get the live depiction. And granted is one that outlines that. And granted is a case where it was remanded because they didn't do an examination regarding the individuals in the application, the guideline, the individuals. So maybe I can see specific intent in the 2G 2.2 C1 word seeking. But let's take Mr. Berry's argument that we don't even need seeking because this involved causing the nature of Augusta's wanting an audience. People are asking actually caused. Why should we read causing as requiring a specific intent? In your honor, again, this is the intent of the statute. If you read some of the other decisions that have have interpreted this. Is there. So you're not. So you can't point anything in the wording of the guidelines of the commentary. I can't. Because if you I'm sorry, I interrupted you. No, no, it's pointing to anything in the text of the guidelines or the application notes first that suggest that causing requires a specific intent. So if the verb is to cause or to to engage, that would be a future looking verbiage. So to engage in, you couple it with the the other portion of the of the ethical part of the guideline or the cross reference to engage for the purpose of transmitting live visual depiction. So that's where I'm getting my. Let's assume we don't buy that because it's not for the purpose of transmitting a live depiction is for the purpose of producing a visual depiction. All right. Or of transmitting a live visual depiction. Either one. If we don't buy that, do you have any cases that require specific intent for causation? Your Honor, again, that's the state of mind argument that I made in earlier. And it's in Crandon cited in my in my brief. Okay. And if I can just touch on some of the the other things as it relates to the 403 analysis, there's a very large component which was touched on tangentially earlier. And that's the cumulative effect of the items that were played. And in this instance, there was no analysis as to what why this was relevant, how it was relevant. What made it the the probe would evaluate outweigh the prejudicial nature of them. And they're no doubt prejudicial. And this court addressed it in Bailey in Bailey. No one certain terms was that it was a case that I cited in my reply brief where the court says you can't, if you're the district court, not put anything on the record and be very careful. If you're going to put these things on the record and you have a good case and you're going to claim harmless error later because that's not appropriate. And if you look at it in Bailey was a case that ultimately upheld the evidence coming in. But at the same time, Sterling warned other individuals going forward that you can't just find refuge in the fact that you have a strong case and put this evidence into into the purview of the jury. And in this case, I mean, I think it's important to note that these are images. There's over a kind of two dozen images of child pornography that are being streamed or submitted to a jury, notwithstanding. Let me see if I understand you, though, because I understand from the prior argument that the images combined was a total of 68 seconds, a minute and eight seconds. That's a total of all the images unless I have that wrong. And you're saying that that was excessively excessive or prejudicial. Absolutely. Your Honor. And those and those are the videos alone. I also understand that these videos were taken over a period of two years. You say that had a prejudicial effect on the on the jury. Which which buttresses our argument, Your Honor, because these not a very few of these videos could have even arguably been when either of our clients were signed into the the application. So if you look at the violent nature of it and this is this is in accordance with Welsh hands, which was a recent case as well as Cunningham, you know, in the cumulative nature of it. Why do you have to show six, eight bonded videos to show some type of conspiracy when you have six thousand different messages? You have the chat messages for the entire, entire room. Why do you have to show that it's cumulative? And that's the other part of the puzzle. You're objecting to 68 seconds, but you're also saying my client was here. You know, he wasn't your defense was he's not really interested in, you know, child porn, especially live child porn. Maybe he's gay, whatever. So the government's caught in between a rock and a hard place. You're saying it's too much evidence, but you're also saying it's too little evidence because it's insufficient evidence to support the conviction or to support that there was a conspiracy. So the government's in a no win situation. They have to put this evidence in to show the culture of the room that everybody knew what was going on there. I don't understand how you can say it was too little evidence for sufficiency and then there was too much for 403. And that's how I couched it, Your Honor, for a variety of reasons. But in this particular instance, none of that evidence is necessary. They have the chat logs that clearly show what this room is about. You're just keeping that in other portions of your brief. You're disputing that there was enough evidence. Your Honor, if you look at the way I couched the sufficiency and I said at worst. So, yes, I'm trying to argue two separate. Are you saying that 403 requires this very fine lawyerly gradation about doing just enough to get over the sufficiency hump, but not so much that it would be irrefutable and overwhelming evidence that it can't be that we require the government to modulate or limit the amount of proof that comes in? So, and Your Honor, what is the relevance of showing videos, these horrific videos, which far and above exceeded Welsh and Cunningham? You know, it does go to the culture of the room. Frankly, you may have gained from my questions. I'm very, very troubled. 403 and 404B are things that I've really wrestled with over the years, really problematic. But it does seem to go to the culture of the room. It's one thing to read it in a chat log, but to see it. Now, there's another issue about how much of it you need to see. That does convey to the jury what the folks who are in that room were interested in and by that interest promoting. Well, again, Your Honor, it's the cumulative effect of this. You don't need to do it two dozen times. It's not 68. How many seconds? That's his point. Your Honor, you can have a description of it. We offered to stipulate that there was child porn in that room, and I understand. That's not going to get it. Just stipulating to the fact that it's child porn in no way suggests to anybody what was going on in that room. That's exactly why Mr. Berry is saying he had to show some video of it. Again, there's an issue about how much of it he showed, but describing the room as child pornography doesn't begin to convey. Your Honor, respectfully, in Welsh hands, a description was too much. Again, it far and above exceeded what was put here. The only relevance that has that's not cumulative is to engender exactly the reaction in anybody that would have. What about Bailey? Because there you've got a guy, point-blank range, guy shot in the head, blood oozing out into the sidewalk. Yet we found, given the combination of evidence, as gruesome as it was, as unnecessary as it was, it was nevertheless harmless. Well, and that's the problem we have here, Your Honor. This evidence is not harmless. Again, there was a stern warning issued in Bailey about using this type of evidence to prove your case in excess. It was cumulative in this particular instance, but this is different than Cunningham. This is different than Welsh hands. Here you, in Cunningham and Welsh hands, you had the video or the items on the computer, and even then it wasn't admissible. Wait, I thought the difference was that maybe it was in Welsh hands or Cunningham. I can't keep it straight, but in some of these child porn cases, the defense is solely, yeah, it was there. I'm not disputing it was child porn. The sole dispute is, you know, some worm or virus put those things on my computer. That's not the dispute here. The dispute here is, did I know what I was doing being in this room? I mean, and that's a different kind of dispute because it goes to mens rea. It doesn't go to really identity or the act. Well, and Your Honor, in Welsh hands, there was harmless error. It was found as well as Bailey. And that's the distinction between this case is you don't have those. And you just have, this jury was getting barraged with, I mean, I can sit here and tell you, I can't describe how revolting that is. They came with two acquittals. And again, they have two acquittals. And they're putting part of the brief, and it's a very poignant sentence. It talks about how emotion can be the wind that overwhelms the strength of logic, something like that. And I read it, and I said, well, that's a nice episterial flourish, and I tend to agree with it. But then I read it a little bit further, and I say, well, God damn, they got two acquittals here. I don't know what to say to that, Your Honor. I know. But yes, because, you know, but nevertheless, you know, those are the issues that we had during trial. And I don't think those videos were appropriate to be published to the jury, especially in the way that they were. Thank you. Unless there are any more questions by any of my colleagues. Judge Babies, any questions? I have nothing else. I would like a transcript. Yeah, thanks for reminding me. I would like to get a transcript of this. And we'll ask Mr. Berry and defense counsel to speak with Mr. Keene about that. But we'll ask the government to pay for the transcript rather than splitting it. Since these folks are going to be out of a job for an awfully long time, they're not going to have to pay for a transcript. I also want to thank the candor. And I know it's not easy. I cannot imagine. As a trial judge, I had a number of these cases. And I know some of the emotion that goes into them. But I should ask for Mr. Daniels continuing to represent the clients. The court really appreciates that. Mr. Berry, you said all you do are these cases. I don't know how you don't have more gray hair in your head or have any hair in your head. But all three of you gentlemen have very, very difficult jobs. And we really appreciate the work. Thank you, Your Honor. I appreciate that. In this case and in other cases. Thank you very much.